50 P.3d 420

**Alvera PAXSON, Plaintiff–Appellant,**

**Stephen L. Cox, Attorney–Appellant,**

v.

**Robert J. GLOVITZ, a single man dealing with his sole and separate property, Defendant–Appellee.**

No. 1–CA–CV–01–0571.

Court of Appeals of Arizona,
Division 1, Department C.

July 25, 2002.

Review Denied Dec. 3, 2002.

As Amended Feb. 6, 2003.

Cox and Cox By Alfred S. Cox, Phoenix, Attorneys for Appellants.

Jaburg & Wilk, P.C. By Kathi Mann Sandweiss, Lawrence E. Wilk and Stephen C. Rich, Phoenix, Attorneys for Appellee.

## OPINION

EHRLICH, Judge.

¶ 1 Alvera Paxson and her attorney, Stephen L. Cox, appeal a summary judgment granted Robert J. Glovitz by the superior court, thus denying Paxson relief in her action to establish a prescriptive easement over real property owned by Glovitz. The court declared that the easement was a permissive one, and it awarded Glovitz attorneys' fees from Paxson and Cox jointly and severally. We find, however, that a prescriptive easement was established as a matter of law, and, therefore, we reverse the judgment and remand this case.

### FACTS AND RELEVANT PROCEEDINGS

¶ 2 The material facts are not disputed. Paxson and Glovitz own adjoining parcels of residential property. Together, the two parcels may be described as forming a rectangle; the long axes are horizontal along the northern and southern boundaries of the property. The top or northern half of the rectangle is owned by Glovitz. The bottom or southern half has been divided from north

to south into two sections; Paxson owns the eastern portion. Sixty-fourth Street runs north and south along the eastern boundary of the rectangle.

¶3 Immediately before February 1979, the southern half of the rectangle was one parcel jointly owned by Eugene and Irma Murphy, and Roger Baker. That month, the Murphys and Baker divided the land roughly in half from north to south with the result that Baker thereafter owned the eastern half and the Murphys took the western half.[1]

¶4 Later in 1979, the Murphys and Baker bought the parcel comprising the northern half of the rectangle. They then orally agreed to create an easement running east and west straddling the northern and southern parcels to facilitate access to 64th Street, locating this easement on the boundary line between the northern and southern halves of the rectangle, running west some 311 feet from 64th Street, past Baker's western property line and continuing onto the Murphys' land where it dead-ended. Intending to settle the matter "for all time," they agreed that the easement would be twenty feet wide, ten feet on either side of the dividing property line.

¶5 After the easement was settled, Mr. Murphy had it paved. He also gave instructions to a title agency to prepare a property description so that a formal easement could be recorded. For reasons not in the record, the easement was never recorded, and no written grant of easement was produced. There is, however, no dispute as to the original intention to create the easement, and it is this easement, a strip of land ten feet wide across Glovitz's property, that is the subject of Paxson's claim.

¶6 In 1984, the Daleidens purchased the Murphys' southwestern parcel. The next year, they bought from the Murphys and Baker the northern half of the rectangle.

¶7 The Daleidens owned the property until 1998, when they sold it to Glovitz. When they bought the property, the Murphys and Baker told them that the paved roadway was for garbage collection and other public access, and, during the time the Daleidens owned the property, the roadway was used by members of the public, by visitors to their home and by the residents of the house now owned by Paxson, as well as by utility, postal, and other private and commercial vehicles. The Daleidens believed that this use was as a matter of right; they gave no permission.

¶8 Paxson acquired the Baker parcel in 1995. She was shown the paved easement and told that it was for her use and for that of the general public. The City of Scottsdale had posted a sign at the entry: "Not a Through Street."

¶9 Paxson took part in measuring the paved driveway. The property line between Glovitz's northern parcel and Paxson's property is marked at the corners by surveyor's pins, and the driveway covers at least ten feet of the Glovitz property, continuing west in a straight line past Paxson's western boundary line.

¶10 When Glovitz purchased the property, he questioned the Daleidens about the driveway and was told that it had always been used for ingress and egress by neighbors as well as by the public. Glovitz knew that the twenty-foot-wide driveway extended ten feet onto the property he was purchasing. He also knew that "everybody used it" if for no other reason than that the Daleidens told him that the driveway, "throughout their ownership, had always been used for ingress and egress by neighbors as well as the public."

¶11 In September 2000, Glovitz began to construct a block fence along his property line where the driveway ran, and Paxson filed this action to obtain an easement by

---

1. Because the Murphys needed access to 64th Street, the deeds by which the parties divided the parcel provided for a driveway easement over the northern 20 feet of Baker's parcel, extending west along his property line from 64th Street to the Murphys' land. This easement is not in dispute, and, in fact, it has been wholly or partially blocked by a wall on the Paxson property since approximately 1983.

prescription for the ten-foot portion of the driveway extending onto Glovitz's land. She also sought a temporary restraining order ("TRO") and preliminary injunction.

¶ 12 At the hearing for the TRO and preliminary injunction, Glovitz took the position that use of the purported easement had never been hostile but was in fact permissive. Paxson contended that use of the property as a matter of right, over time, created a presumption of "hostility."

¶ 13 Mrs. Murphy testified at the hearing as to the circumstances surrounding the creation of the easement along the property line between the northern and southern parcels, paving ten feet on either side to make a twenty-foot road. The Murphys and Baker had anticipated that additional houses would be built on the land and that these people would have access over the easement "so that garbage trucks could come up, so fire trucks could come up, and so we could have any access that we needed."

¶ 14 Mrs. Murphy also testified that, while she owned the land, the easement was used by various people and entities, and that the former owners of the Paxson property had used the driveway for vehicles to get to their garage and the back part of their property. When the property was sold to the Daleidens, they were told that it was a road and an easement. She also testified that the use of the roadway by the owner of the Paxson property was a matter of right and not by permission.

¶ 15 The superior court denied interim relief to Paxson. It found no basis in fact or law for a TRO or preliminary injunction and no likelihood of success on the merits of Paxson's claim.

¶ 16 Glovitz then moved for summary judgment. He argued that Paxson could not establish the elements of a prescriptive easement as a matter of law. The basis for his argument was that the driveway had been established by agreement among the adjacent landowners and, therefore, its use had remained permissive since inception.

¶ 17 Paxson countered that the encroachment on Glovitz's land had been "open, visible, continuous and unmolested" for more than ten years and was therefore presumptively under a claim of right and not by license of the owner, citing *Gusheroski v. Lewis*, 64 Ariz. 192, 167 P.2d 390 (1946). Glovitz replied that the undisputed intention to create the easement rendered the use permissive and rebutted the presumption of hostility. The superior court granted Glovitz summary judgment "for the reasons and based upon the facts and legal authorities cited by [him]."

¶ 18 Glovitz then moved for an award of attorneys' fees. He claimed an entitlement to fees on several bases, including Arizona Rule of Civil Procedure 11(a) and Arizona Revised Statutes ("A.R.S.") §§ 12–349 (1992), 12–350 (1992) and 12–1103(B)(1994).[2] He asked that fees be awarded against both Paxson and her counsel on the basis that Paxson's claim had no basis in fact or law. The superior court granted the motion for fees and signed the form of judgment presented by Glovitz quieting title to the property and awarding Glovitz fees of $38,810.50 against Paxson and her counsel, jointly and severally.

¶ 19 Paxson moved for new trial. She contended that the open and notorious use of the easement since 1979, more than the prescribed ten-year period of limitation, had created a presumption of hostility. The Murphys and Baker, although intending to create a recorded, formal easement, had instead, Paxson argued, created an easement by parol, unenforceable because of the Statute of Frauds, but effective to initiate a use that was thereafter adverse according to the principles of *Tenney v. Luplow*, 103 Ariz. 363, 442 P.2d 107 (1968). Paxson also cited RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.16 (2000)("RESTATEMENT: SERVITUDES")

---

2. Rule 11(a) authorizes fee awards for claims that are not well-founded or interposed for improper purpose. Sections 12–349 and 12–350, A.R.S., authorize fee awards for matters which are without substantial justification, or primarily for delay or harassment or which have been unreasonably expanded or delayed. Section 12–1103(B), A.R.S., authorizes an award of fees in an action to quiet title when the party seeking relief has tendered a deed and nominal fee to the adverse party in an effort to resolve the dispute before seeking judicial relief.

for the proposition that an "intended but imperfectly created" easement gives rise to an easement by prescription when the other requirements for such easements are met. The superior court denied the motion without explanation, and Paxson and Cox appealed from the judgment.

## DISCUSSION

¶ 20 Paxson's essential contention is that the unrecorded easement created by agreement in 1979 ripened into a prescriptive easement over what is now Glovitz's property. Glovitz argues that the agreement to create the easement rendered the use permissive from its inception and not hostile, defeating Paxton's claim to an easement by prescription. In reviewing a summary judgment, when the material facts are undisputed, we consider whether the superior court correctly applied the applicable law. *United Servs. Auto. Ass'n v. DeValencia*, 190 Ariz. 436, 438, 949 P.2d 525, 527 (App.1997).

¶ 21 While neither the parties nor we have discovered any Arizona case controlling the resolution of this case, there is longstanding Arizona authority on the closely related subject of adverse possession that sets forth applicable principles. These same principles underlie the rule of the RESTATEMENT: SERVITUDES § 2.16 relating to prescriptive easements, and we conclude that the Restatement rule is the one that we should follow in resolving this dispute.[3]

### A. Requirements of a Prescriptive Easement

¶ 22 To gain a prescriptive easement,

a person must establish that the land in question has actually and visibly been used for ten years, that the use began and continued under a claim of right, and [that] the use was hostile to the title of the true owner of the land.

*Harambasic v. Owens*, 186 Ariz. 159, 160, 920 P.2d 39, 40 (App.1996)(citing *Ammer v. Arizona Water Co.*, 169 Ariz. 205, 208, 818 P.2d

190, 193 (App.1991); A.R.S. §§ 12–521(A), 12–526(A)); *see* RESTATEMENT: SERVITUDES § 2.17. The ten-year period of use derives from the statute of limitations for bringing an action to quiet title. *Gusheroski*, 64 Ariz. at 195, 167 P.2d at 392; A.R.S. § 12–526(A)(action for recovery from adverse possession must be commenced within ten years). If the use is permissive, it cannot ripen into an easement by prescription because it is neither "hostile" nor "adverse" to the owner's title. *Herzog v. Boykin*, 148 Ariz. 131, 133, 713 P.2d 332, 334 (App.1985).

¶ 23 There is no dispute in this case that the easement was created in 1979 and that it has been actually and visibly used since that time, a period of more than ten years. The only issue is whether the circumstances of the creation of the easement were, in legal effect, adverse or permissive. Glovitz argues that the use was permissive because it began and continued by agreement. Paxson contends that the Murphys and Baker "imperfectly" created the easement by not complying with the formalities to place it of record, thus inaugurating a use adverse to the owners' title just as the parol gift of real property served to begin an adverse possession in *Tenney.*

¶ 24 The Murphys and Baker intended in 1979 to create a recorded easement for use by all then and future owners of the surrounding land and for public access. Had the easement been recorded, as the parties intended it to be, subsequent rights of use would have been permanently fixed and not "permissive," that is, not subject to revocation as would be a license. *See Continental Tele. Co. of the West v. Blazzard*, 149 Ariz. 1, 5–6, 716 P.2d 62, 66–67 (App.1986) (unrecorded easement is a license and does not run with the land or bind subsequent purchasers without notice).

¶ 25 Glovitz's argument that the use was permissive runs contrary to the undisputed intent of the parties to relinquish their exclusive rights to their land permanently in favor of adverse rights to use the easement.

---

3. In the absence of contrary precedent, Arizona courts look to the Restatement. *Campbell v. Westdahl*, 148 Ariz. 432, 436, 715 P.2d 288, 292

(App.1985)(applying RESTATEMENT (SECOND) OF PROPERTY § 15.2 (1977)).

In other words, the Murphys and Baker made an oral grant of easement. It long has been recognized in Arizona that an oral or parol grant of *title* to real property, while unenforceable because of the Statute of Frauds, will, when coupled with possession, give rise to the beginning of an adverse possession. *Tenney*, 103 Ariz. at 368, 442 P.2d at 112.

¶ 26 In *Tenney*, Luplow, who had been living in a house with the permission of the owner, was given the abstract of title to the property and told that it belonged to her. She therefore continued to occupy the home, paying taxes and making improvements, for more than the ten years required to take title by adverse possession. After the death of the donor of the land, the donor's estate attempted to retake the property, but Luplow successfully sued to quiet title by adverse possession. The supreme court affirmed the judgment in her favor, stating:

> Parol gifts of land are within the Statute of Frauds ... yet plaintiff is not precluded from asserting her adverse claim even though she mistakenly thought her title was perfected by the delivery of the abstract of title. The character of plaintiff's possession is the crucial turning point here.

*Id.*

¶ 27 The supreme court explained that a mistake as to one's right of possession is not determinative. The intention to take possession is the test by which adverse possession is judged, and the court cited with approval cases from other jurisdictions in which it was held that "entry [on land] under a parol gift can nevertheless be adverse as against the true owner." *Id.*

¶ 28 As does Glovitz, Tenney argued that, because Luplow's occupancy of the property had begun with permission, her use could not be adverse. As we now reject that argument, the court stated:

> The fallacy in the argument for the defendants here lies in the apparent assumption that permission is not sufficient to inaugurate an adverse possession. Such, however, is not the true principle, for even the cases cited by the defendants lay down the doctrine that a gift of land by parol, itself permissive in its character and voluntary in its inception, establishes the beginning of an adverse possession.

*Id.* (quoting *Miller v. Conley*, 96 Or. 413, 190 P. 301, 303 (1920)).

¶ 29 The supreme court concluded that making a parol gift of the property, vacating it and permitting the donee to remain there for at least ten years was no less adverse than if a claimant had taken possession of the property at gunpoint. Moreover, giving possession with the intent to confer legal title was different from giving permission to occupy land in subordination to the legal title. Once the attempted gift of title had been made, Luplow's occupancy of the premises "was no longer gratuitous but rather her interest commenced to ripen from that point into a fee simple by adverse possession." *Id.* at 369, 442 P.2d at 113.

¶ 30 The *Tenney* case thus stands for the proposition that an intended, but imperfect, transfer of real property can inaugurate an adverse possession, and it is in accord with the earlier case *Spillsbury v. School District No. 19 of Maricopa County*, 37 Ariz. 43, 288 P. 1027 (1930). In *Spillsbury*, the claimant to the land was unable to produce a deed but able to produce other recorded instruments, signed by the record title holders, reciting that the property had been deeded away. This evidence, the supreme court held, was sufficient to "negative" the idea of occupancy by license and justified the superior court in finding that, because the property had been occupied pursuant to a deed, such occupancy was necessarily hostile to the record title holders and known to be so by them. *Id.* at 47–48, 288 P. at 1029. As a result, the claimant succeeded in establishing title by adverse possession.

¶ 31 Both the *Tenney* and *Spillsbury* cases involved the establishment of title by adverse possession, not an easement by prescription as presented in this case, but the differences are slight for this purpose. Adverse possession leads to title, while a prescriptive easement leads to the nonexclusive right of continued use. *Ammer*, 169 Ariz. at 208, n. 1, 818 P.2d at 193, n. 1. The principles of these adverse possession cases sensibly

apply to Paxson's claim of prescriptive easement.

¶ 32 Indeed, RESTATEMENT: SERVITUDES applies these same principles to easements by prescription. Section 2.17 establishes requirements for prescriptive easements: a use that is "open or notorious" and "continued without effective interruption for the prescriptive period." *See Harambasic*, 186 Ariz. at 160, 920 P.2d at 40. Section 2.16 provides in pertinent part that an easement by prescription may be created by "a use that is made pursuant to the terms of an intended but imperfectly created servitude." Comment a to § 2.16 gives the rationale for the rule and adds that it applies when "people try to create a servitude but fail, initially because they do not ... reduce their agreement to writing, or because they fail to comply with some other formal requirement imposed in the jurisdiction." If the parties then proceed to act as though they were successful for the prescribed time, the servitude is created as long as the other requirements for such servitude are met. As stated in Comment a, complying with the terms of the easement for the set period "substitutes for compliance with the required formality because it provides satisfactory proof of the existence and terms of the servitude and resolves any doubts as to the parties' intent that may have been created by their failure to comply with the formality."

¶ 33 As further explained in Comment a, the drafters of the Restatement have specifically enunciated this rule to clear confusion that could arise over the words "adverse" or "hostile" when applied to an imperfectly created easement. Indeed, if the requirement of hostility is taken "too literally," it could lead to "the erroneous conclusion that use

pursuant to an oral grant cannot give rise to a prescriptive right because it is not adverse," whereas, not only may a prescriptive easement be based upon a continuing adverse use for the period of the statute of limitations, but also, as explained in Comment b to § 2.17, the long-continued use may act to "perfect a flawed title." RESTATEMENT: SERVITUDES § 2.17 cmt. b.[4]

¶ 34 The predecessors in title to Paxson and Glovitz attempted to create an easement in 1979; this effort was "imperfect" for lack of compliance with the necessary procedures. The property owners who agreed to create the easement and their grantees acted to recognize it thereafter, from 1979 until Glovitz acted in 2000, a period in excess of the prescriptive period of ten years.[5] An easement by prescription had, therefore, been established before Glovitz bought the property in 1998. The superior court erroneously granted summary judgment to Glovitz on the apparent basis that the easement was, in legal effect, merely a permissive license which Glovitz could revoke.

### B. Scope of the Easement

¶ 35 As an alternate basis for summary judgment, Glovitz contended that Paxson had improperly expanded the scope of the easement because she was using or intending to use her property in ways allegedly different from its historical uses. The superior court in granting Glovitz's motion did not set forth the basis for its ruling, and we are unable to determine whether its decision was based upon this argument as well. Glovitz renews the argument as an alternative basis for affirming the judgment.

---

4. RESTATEMENT: SERVITUDES contains an illustration that is essentially identical to this case: "O, the owner of Blackacre, and A, the owner of Whiteacre, orally agreed to create mutual easements for use of a common drive to be built along their common boundary. They both used the driveway for 20 years for access to the garages at the rear of their lots. The prescriptive period in the jurisdiction is 15 years. Upon these facts, the conclusion would be justified that servitudes by prescription had been acquired in favor of both Blackacre and Whiteacre for use of the common drive." RESTATEMENT: SERVITUDES § 2.16 cmt. d, illus. 4.

5. The adverse use need not have been carried on by the same person for the entire ten years. The doctrine of tacking permits combining the successive uses of those in privity by conveyance or agreement or understanding that refers the successive adverse use to the original adverse use and transfers that use. *Ammer,* 169 Ariz. at 209, 818 P.2d at 194.

¶ 36 On this record, it would have been error to quiet title to the easement in Glovitz upon the basis that Paxson was exceeding the scope of reasonable use. The holder of an easement is entitled to use it "in a manner that is reasonably necessary for the convenient enjoyment" of the easement or servitude. RESTATEMENT: SERVITUDES § 4.10. As stated in § 4.10, the "manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefitted by the servitude." Section 4.10 further explains that permissible uses of an easement are any uses which do not "cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment."

¶ 37 Although Glovitz complained of the uses Paxson allegedly is making of her *property,* he presented no evidence that her use of the *easement* was causing unreasonable damage or interfering unreasonably with the enjoyment of his property, nor is there evidence that Paxson is using her property in an unlawful manner. Rather, Paxson disputes that she is using the easement for any purpose substantively different from its historical uses. Such a controversy creates an issue of fact that could not be resolved by summary judgment. More importantly, the appropriate remedy for an unreasonable use of an easement is to seek injunctive relief to limit the use, plus damages if warranted.

See *Pinkerton v. Pritchard,* 71 Ariz. 117, 127, 223 P.2d 933, 938 (1950).

### C. Attorneys' Fees and Costs

¶ 38 The resolution of this matter in favor of Paxson serves to reverse the attorneys' fees awarded to Glovitz. Paxson has prevailed on appeal, and her claim was therefore not without merit so as to warrant application of A.R.S. §§ 12–349 and 12–350 or Arizona Rule of Civil Procedure 11(a). Glovitz did not succeed in quieting title to the easement so as to justify a fee award pursuant to A.R.S. § 12–1103(B).

¶ 39 As the prevailing parties on appeal, Paxson and Cox are entitled to recover their costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21(a).

### CONCLUSION

¶ 40 The judgment is reversed, and this matter is remanded to the superior court.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge, and JEFFERSON L. LANKFORD, Judge.