IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

BOGDAN DABROWSKI, et al., *Plaintiffs/Counter-Defendants/Appellants/Cross-Appellees*,

*v.*

DAVID C. BARTLETT, *Defendant/Counter-Claimant/Appellee/Cross-Appellant.*

No. 1 CA-CV 17-0380
FILED 5-7-2019

Appeal from the Superior Court in Maricopa County
No.  CV2013-008944
The Honorable Lori Horn Bustamante, Judge

**AFFIRMED IN PART; REVERSED IN PART; JURISDICTION ACCEPTED/RELIEF GRANTED IN PART AND REMANDED WITH INSTRUCTIONS**

COUNSEL

MacQueen & Gottlieb PLC, Phoenix
By Benjamin L. Gottlieb (argued), Patrick R. MacQueen
*Counsel for Plaintiffs/Counter-Defendants/Appellants/Cross-Appellees*

Radix Law, PLC, Scottsdale
By Donald R. Alvarez
*Counsel for Defendant/Counter-Claimant/Appellee/Cross-Appellant*

---

**OPINION**

Judge Paul J. McMurdie delivered the opinion of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Kent E. Cattani joined.

---

**M c M U R D I E**, Judge:

¶1          Bogdan and Jolanta Dabrowski appeal from a judgment granting David C. Bartlett a private way of necessity ("private condemnation") over the Dabrowskis' property. Bartlett cross-appeals, contending he was entitled to either express easement rights or an easement by implied way of necessity. For the reasons set forth below, we hold that: (1) an unactivated easement is subject to a merger; (2) a common law easement by implied way of necessity does not exist if the severance of the parcel did not cause the lot to lack a reasonable outlet; (3) unity of ownership for a merger may occur even if the parties are technically different; (4) in a private condemnation action, a finding that a more reasonable route exists through the subject property constitutes "bad faith, oppression, or abuse of power" under *Solana Land Co. v. Murphey*, 69 Ariz. 117, 125 (1949), precluding the condemnor from condemning its selected route; and (5) a private condemnation judgment must be satisfied before a final order of condemnation can issue and an easement recorded. Accordingly, we affirm the judgment on the easement claims and remand for the court to determine the route, scope, and cost of the private condemnation.

## FACTS AND PROCEDURAL BACKGROUND

¶2          The parties dispute whether Bartlett should have access to his five-acre lot in Cave Creek over the Dabrowskis' adjacent lot. Both lots were part of a larger parcel that was split into three lots in 1999, then identified as Parcels A, B, and C. In 2002, Parcel A was divided into three separate lots of approximately five acres each, which include the lots now owned by the Dabrowskis ("Lot 1") and Bartlett ("Lot 2") (collectively the "Lots").

**¶3** Until 2007, Rockaway Hills Drive (the "access road") was the only road on the land.



On March 2, 2000, Jack Lewis, the owner of Parcels A and B, declared an easement that reached Lot 2 through Lot 1 (the "2000 Express Easement") and then sold the Lots in Parcel A.



**¶4** In April 2001, Lewis conveyed Parcel B to Andrew C. Jacob in his capacity as trustee of the ACJ [Andrew C. Jacob] Declaration of Trust ("Jacob Trust"). On September 18, 2001, Lewis reacquired the Lots via a trustee's sale.

**¶5** On September 18, 2002, the Town of Cave Creek approved a lot split ("2002 Lot Split"), which established the Lots as they currently appear. The survey that accompanied the 2002 Lot Split was prepared for Jacob and reflected an ingress, egress, and utility easement over Parcel B for the benefit of Lot 1, similar to the 2000 Express Easement, but did not extend to Lot 2. The month after the 2002 Lot Split was approved, Lewis conveyed Lots 1 and 2 to Jacob and his wife.

**¶6** Cave Creek approved a second lot split of Parcel A on April 11, 2003, based on a separate survey ("2003 Lot Split") also prepared for

Jacob. The 2003 Lot Split was recorded on April 12, 2003. The survey, depicted below, showed an easement over Parcel B reaching the midpoint of the eastern border of the Lots and did not encumber Lot 1 for the benefit of Lot 2.



Figure 3

¶7            The next month, Jacob and his wife sold the Lots to Bartlett ("Jacob-Bartlett conveyance"). In 2005, Bartlett conveyed Lot 1 to Michael Hiltner and Julie Mahon but retained Lot 2 in his capacity as a trustee of the JoshuaBleu Trust ("Bartlett-Hiltner conveyance"). Bartlett did not record an express easement in connection with the conveyance. The Jacob Trust sold Parcel B to Bryan Anderson in June 2005.

¶8            In 2007, Hiltner completed construction of a house and driveway located on Lot 1. Anderson began construction of his house on Parcel B in 2006, which was completed in 2014. The Dabrowskis acquired the house and property comprising Lot 1 via a trustee's sale in January 2012. A dispute arose shortly thereafter between the Dabrowskis and Bartlett regarding Bartlett's access to Lot 2, leading to the Dabrowskis filing suit to quiet title in 2013. Bartlett counterclaimed, alleging that he was entitled to an implied way of necessity, an implied easement of necessity, or in the alternative, a private condemnation across Lot 1. Bartlett later added a counterclaim alleging that he had express access rights via the 2000 Express Easement. At the time of trial, the land appeared as follows:



Figure 4

¶9            The superior court granted summary judgment to the Dabrowskis on Bartlett's express easement claim, finding that the 2000 Express Easement had terminated by a merger. The parties proceeded to a bench trial on the remaining claims. Following the trial, the court ruled that:

> [T]he 2003 Lot Split did not create a valid easement, there is no express easement, and there is no implied easement at this time over the Dabrowski property in favor of the Bartlett lot. The court further finds there is no other adequate alternative access to Bartlett's property. Accordingly, [Arizona Revised Statutes ("A.R.S.") section] 12-1202 allows a [private condemnation] under the circumstances presented in this case.

The court allowed Bartlett to "select the route location and nature of the [private condemnation] ensuring the greatest amount of deference to the privacy and concerns of the Dabrowskis," ordered Bartlett to "compensate the Dabrowskis for the easement over their property," and requested simultaneous briefing regarding the values of the available routes, stating that it could not "provide a value based upon the testimony provided at the hearing."

¶10          In the post-trial briefing, the Dabrowskis submitted affidavits from a real estate appraiser, their trial expert, and Bogdan Dabrowski. They sought compensation ranging from $96,000 to $433,250 depending on Bartlett's choice of route. Bartlett objected, contending the affidavits had not been disclosed or offered at trial. The court overruled his objection and determined compensation for three potential routes as follows:

"Graham #1" Easement = $37,200

"Graham #2" Easement = $36,000

"Slyder" Easement = $96,250

The considerably higher value assigned to the Slyder Easement reflected the increased burden the easement posed on the Dabrowskis' property. On Bartlett's motion for reconsideration, the court allowed him to present rebuttal evidence concerning value but affirmed its compensation determinations.

¶11 Bartlett submitted a proposed form of judgment. The Dabrowskis objected to the proposed judgment and asked the court to order Bartlett to compensate them when the easement was recorded, and to impose several new requirements on Bartlett, including: (1) indemnifying them for any liability resulting from construction; (2) repairing and maintaining their driveway following construction; (3) preserving unspoiled nature beyond 20 feet of the easement width; and (4) requiring Bartlett and his successors and assignees to equally share in future costs of the maintenance and repair of the shared roadway. The court rejected the Dabrowskis' requests and entered a partial final judgment ordering Bartlett to choose either the Graham #2 or Slyder Easement and to compensate the Dabrowskis before "constructing a roadway . . . or by June 1, 2017, whichever is earliest." The judgment is silent on the timing of the recording. The court also ordered the parties to bear their attorney's fees and costs, ruling that Bartlett's statement of costs was untimely.

¶12 The Dabrowskis timely appealed, and Bartlett timely cross-appealed.

## DISCUSSION

### A. We Have Appellate Jurisdiction Over Some of the Claims Raised by the Parties and We Exercise Special Action Jurisdiction to Decide the Remaining Claims.

¶13 Although neither party has raised the issue, we have an independent obligation to determine whether we have appellate jurisdiction, *Robinson v. Kay*, 225 Ariz. 191, 192, ¶ 4 (App. 2010), and we must dismiss an appeal over which we lack jurisdiction, *Davis v. Cessna Aircraft Corp.*, 168 Ariz. 301, 304 (App. 1991). Because "[p]ublic policy is against deciding cases piecemeal," our jurisdiction over appeals generally is "limited to final judgments which dispose of all claims and all parties." *Musa v. Adrian*, 130 Ariz. 311, 312 (1981); *see also* A.R.S. § 12-2101. However, Arizona Rule of Civil Procedure 54(b) permits the superior court to enter an appealable final judgment on fewer than all claims in a case, *Garza v. Swift Transp. Co.*, 222 Ariz. 281, 284, ¶ 13 (2009), when the judgment

"dispose[s] of at least one separate claim of a multi-claim action," *Davis*, 168 Ariz. at 304. We review *de novo* whether the superior court has appropriately certified a judgment as final and appealable under Rule 54(b). *Davis*, 168 Ariz. at 304.

¶14        Here, the superior court included language from Rule 54(b) in the judgment, indicating portions of the judgment were not final but did not note which parts. The parties appealed and briefed the judgment in its entirety. "Certification under Rule 54(b), however, 'does not give this court jurisdiction to decide an appeal if the judgment in fact is not final, i.e., did not dispose of at least one separate claim of a multi-claim action.'" *Grand v. Nacchio*, 214 Ariz. 9, 16, ¶ 17 (App. 2006) (quoting *Davis*, 168 Ariz. at 304). "[A] claim is separable from others remaining to be adjudicated when the nature of the claim already determined is 'such that no appellate court would have to decide the same issues more than once even if there are subsequent appeals.'" *Cont'l Cas. v. Superior Court*, 130 Ariz. 189, 191 (1981) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)). Here, the quiet title action and the private condemnation action are severable. The judgment regarding the Dabrowskis' quiet title action and Bartlett's claims of an equitable interest through Lot 1 are final. Thus, we have appellate jurisdiction to review the quiet-title judgment.

¶15        Conversely, Bartlett's cross-claim for a private condemnation is not final. The final route has not yet been determined, the Dabrowskis have not been compensated, and the court has not entered the final order of condemnation. Therefore, we do not have appellate jurisdiction over those claims. *See Nacchio*, 214 Ariz. at 16, ¶ 17. However, when parties mistakenly raise issues from a non-appealable order, we have the discretion to *sua sponte* accept special action jurisdiction and consider the merits of the claims. *See State v. Bayardi*, 230 Ariz. 195, 197–98, ¶ 7 (App. 2012) (appeal treated as a special action when parties appealed from a superior court minute entry); *Danielson v. Evans*, 201 Ariz. 401, 411, ¶ 35 (App. 2001) (after finding appellate jurisdiction lacking, court *sua sponte* accepted special action jurisdiction); *see also* A.R.S. § 12-120.21(A)(4); Ariz. R.P. Spec. Act. 1(a). We accept special action jurisdiction here because the parties have fully briefed and argued the issues, the superior court has ruled on the claims, and the non-final issues would likely be raised on appeal after a final judgment. We also accept special action jurisdiction because the judge's order raises questions of first impression—which are particularly appropriate for special action review—concerning the application of Article 2, § 17 of the Arizona Constitution and A.R.S. § 12-1126(B). *See Chartone, Inc. v. Bernini*, 207 Ariz. 162, 165–66, ¶¶ 8–9 (App. 2004).

**B.      In the Quiet Title Action, the Court Did Not Abuse Its Discretion by Finding the Dabrowskis Proved That There Was Not an Easement Over Their Property — Either Express or Implied.**

¶16      The Dabrowskis initially brought an action for quiet title under A.R.S. § 12-1101(A):

> An action to determine and quiet title to real property may be brought by any one having or claiming an interest therein, whether in or out of possession, against any person . . . when such person . . . claims an estate or interest in the real property which is adverse to the party bringing the action.

Bartlett's counterclaim asserted that he was entitled to either (1) an express easement; (2) an easement of implied necessity; or (3) an implied easement by way of necessity.

¶17      We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party. *BMO Harris Bank, N.A. v. Wildwood Creek Ranch, LLC*, 236 Ariz. 363, 365, ¶ 7 (2015). For issues resolved at trial, we consider the evidence presented in the light most favorable to upholding the court's rulings. *Town of Marana v. Pima County*, 230 Ariz. 142, 152, ¶ 46 (App. 2012). But we review the court's conclusions of law *de novo* and may draw legal conclusions from facts found or inferred from the judgment. *FL Receivables Tr. 2002-A v. Ariz. Mills, L.L.C.*, 230 Ariz. 160, 166, ¶ 24 (App. 2012); *In re Estate of Musgrove*, 144 Ariz. 168, 170 (App. 1985). To the extent the superior court's decision was based on an interpretation and application of the law, we review its decision *de novo*. *Freeman v. Sorchych*, 226 Ariz. 242, 247, ¶ 11 (App. 2011).

####      1.      The Court Did Not Err by Finding the 2000 Express Easement Terminated as to the Lots.

¶18      Bartlett claims the court erred by finding he did not have an express easement through Lot 1 via the 2000 Express Easement. The superior court determined that the 2000 Express Easement merged when the Lots came under common ownership between 2001 and 2003. Specifically, the superior court found that the Lots were under common ownership on three occasions: (1) under Lewis in 2001; (2) under Jacob in 2002; and (3) under Bartlett from 2003 until he sold Lot 1.

¶19      Merger applies, and an easement terminates, when one party obtains both the greater and the lesser interest in the same property without any intermediate interests in other hands. *Flood Control Dist. of Maricopa*

*County v. Paloma Inv. Ltd. P'ship*, 230 Ariz. 29, 41, ¶ 39 (App. 2012). In such cases, the lesser interest is extinguished. *Id.*

¶20        While Bartlett recognizes the general proposition, he argues that an express easement is not "activated" until the parcels are severed, and—as to portion of the easement granting Lot 2 access through Lot 1—the express easement did not merge because the Lots were not commonly owned at any time after the Bartlett-Hiltner conveyance that severed the parcels. He cites no authority, however, for the proposition that easements that have not been activated are not subject to a merger, and we decline to so hold.

¶21        As there is no Arizona authority directly on point, we look to the Restatement (Third) of Property (Servitudes) ("Restatement (Third)"). *See Paxson v. Glovitz*, 203 Ariz. 63, 67, ¶ 21, n.3 (App. 2002) ("In the absence of contrary precedent, Arizona courts look to the Restatement."). The Restatement (Third) does not exempt easements that have not been activated by separate ownership from the merger. The comments instead provide that merger applies "when the burdens and benefits are united in a single person, or group of persons" because "the servitude ceases to serve any function" and "no one else has an interest in enforcing the servitude." Restatement (Third) § 7.5 cmt. a.

¶22        The benefits and burdens of the 2000 Express Easement were unified during the three periods in which the superior court found common ownership. The fact that those benefits and burdens were later severed in subsequent conveyances did not by itself activate or recreate the easement. *See* Restatement (Third) § 7.5 cmt. b ("A subsequent conveyance of the property that results in separate ownership of the previously dominant and servient estates raises the question whether the parties can re-create the servitude that previously existed on the property without complying with the requirements set forth in Chapter 2. Under the rule stated in this section they cannot."). Indeed, an express easement could not have been reestablished without a writing that complied with the statute of frauds. A.R.S. § 44-101(6) (statute of frauds applies to "an agreement . . . for the sale of real property or an interest therein"); *Owens v. M.E. Schepp Ltd. P'ship*, 218 Ariz. 222, 228, ¶ 24 (2008) ("The statute of frauds enacts a clear legislative prohibition against enforcement of an oral agreement for the conveyance of land."); Restatement (Third) § 2.7.

¶23        Because Bartlett admitted he did not record any document creating an easement from the Bartlett-Hiltner conveyance, we conclude that the superior court correctly granted summary judgment on Bartlett's

express easement claim because Lot 2 did not have access via an express easement through Lot 1.

> **2.** **The Court Did Not Abuse Its Discretion by Finding Bartlett Was Not Entitled to an Implied Easement of Necessity Through Lot 1.**

¶24      Lot 2 also does not have an implied easement of necessity through Lot 1. An implied easement of necessity requires: (1) a single tract of land arranged in a manner where one portion of the land derives a benefit from the other; (2) unity of ownership; (3) severance of the land into two or more parcels; (4) long, continued, obvious use of the subservient land, to a degree which shows permanency—by the dominate land—prior to the severance; and (5) the use of the claimed easement must be essential to the beneficial enjoyment of the dominate land. *See Porter v. Griffith*, 25 Ariz. App. 300, 302 (1975).

¶25      When the Lots were severed in 2005, no road connected Lot 1 to Lot 2, nor did Lot 1 have a connection to the access road on Parcel B. *See supra* ¶ 3, Figure 1. Thus, Bartlett failed to show that at the time of the Bartlett-Hiltner conveyance there was a long, continued, and obvious use of Lot 1 for the benefit of Lot 2.

> **3.** **The Court Did Not Abuse Its Discretion by Finding Bartlett Was Not Entitled to an Easement by Implied Way of Necessity Through Lot 1.**

¶26      Bartlett contends that the Bartlett-Hiltner conveyance caused his lot to become landlocked, resulting in an easement by implied way of necessity. "Under the common law, where land is sold that has no outlet, the vendor by implication of the law grants ingress and egress over the parcel to which he retains ownership, enabling the purchaser to have access to his property." *Bickel v. Hansen*, 169 Ariz. 371, 374 (App. 1991). The doctrine derives from the presumption that when a party conveys the property, it conveys "whatever is necessary for the beneficial use of that

property and retains whatever is necessary for the beneficial use of the land he still possesses." *Id.*[1]

**¶27**         Under the common law, to obtain an easement by implied way of necessity through Lot 1, Bartlett was required to prove: (1) both properties were under common ownership; (2) the properties were then severed; (3) there is no reasonable or adequate outlet for one of the properties; and (4) the need for reasonable access through the severed property existed at the time of severance. *See Coll. Book Ctrs., Inc. v. Carefree Foothills Homeowners' Ass'n*, 225 Ariz. 533, 541, ¶ 30 (App. 2010); *Bickel*, 169 Ariz. at 374. If an implied way of necessity exists, it may survive through multiple conveyances and is not affected by use or the lack thereof. *Bickel*, 169 Ariz. at 375. As explained below, Bartlett failed to prove that he was entitled to the common law easement by implied way of necessity because he was unable to show that it was the severance of the Lots that caused his property to lack an adequate outlet.

> **i.        At the Time of Severance, the Lots Did Not Have an Express Easement Through Parcel B.**

**¶28**         Bartlett argues that at the time of Bartlett-Hiltner conveyance, he had an express easement from Lot 1 through Parcel B to the access road—as evidenced by the 2000 Express Easement—giving the Lots a reasonable outlet and therefore the severance of the Lots caused his lot to lack an outlet. The Dabrowskis contend that the Lots' access through Parcel B terminated through merger when Jacob owned the Lots and Parcel B concurrently in 2002. Bartlett maintains that there was no unity of ownership because Jacob, as trustee for the Jacob Trust, owned Parcel B, while Jacob and his wife jointly owned the Lots.

**¶29**         In 2000, Lewis—the then owner of the Lots and Parcel B—recorded an express easement, providing access from Lot 1 through Parcel B to the access road. *See supra* ¶ 3, Figure 2. In March 2000, Jacob, as trustee of the Jacob Trust, purchased Parcel B. Jacob and his wife then purchased the Lots in December 2002. Before Jacob and his wife purchased

---

[1]        Because neither party raised the issue of whether granting a common law easement by implied way of necessity is proper under Article 2, § 17 of the Arizona Constitution and the legislature's prescribed remedy for landlocked property in A.R.S. § 12-1202, we assume without deciding that a conveyance that causes a property to become landlocked may be entitled to an easement by implied way of necessity.

the Lots, Allan Gray prepared a lot survey for Jacob showing the Lots' access through Parcel B, but not following the 2000 Express Easement. Jacob applied for and received certification for the 2002 Lot Split, and it was recorded. The month before selling the Lots to Bartlett, Jacob obtained another lot survey from Gray. Jacob again applied to the Town of Cave Creek to certify the 2003 Lot Split, which was done, and the 2003 Lot Split was recorded. *See supra* ¶ 6, Figure 3.

¶30        Arizona courts have not addressed the concept of merger relating to the unity of ownership when the parties involved share interests but are technically different. In this case, two technically different owners were involved: Jacob Trust owned Parcel B while Jacob and his wife owned the Lots. Other jurisdictions, however, have applied a control test to establish unity of ownership. *See Cosmopolitan Nat'l Bank v. Chicago Title & Tr. Co.*, 131 N.E.2d 4 (Ill. 1955); *Houston Bellaire, Ltd. v. TCP LB Portfolio I, L.P.*, 981 S.W.2d 916 (Tex. App. 1998).

¶31        In *Houston Bellaire*, the court, looking to *Cosmopolitan*, concluded that although "the ownership of the two lots was technically different, . . . '[t]here was, in effect, common ownership of both properties sufficient to indicate the ability to arrange and adapt the property in a manner sufficient to satisfy rules of property in the establishment of easement by implication.'" *Houston Bellaire*, 981 S.W.2d at 920–21 (quoting *Cosmopolitan*, 131 N.E.2d at 7). The court concluded that the parties "with the power to arrange and adapt the properties" did arrange matters in a way that created an implied easement. *Id.*

¶32        As an owner of the Lots and the trustee of the trust that owned Parcel B, the evidence shows Jacob had the power to arrange and adapt the properties. First, Jacob commissioned the 2002 Lot Split when Parcel B was owned by Jacob Trust. Jacob and his wife purchased the Lots after the Town of Cave Creek approved the lot split, and the survey was recorded. Next, Ian Cordwell, the Director of Planning and the Zoning Administrator for the Town of Cave Creek, testified that Jacob applied for a building permit for Lot 2 on March 11, 2003. The town would not approve a building permit unless the owner of the property could show that each lot had access from a dedicated public right of way to the parcel itself. At the time of Jacob's application for the building permit, he indicated that Lot 2 lacked access. Subsequently, Jacob again commissioned Gray to create the 2003 Lot Split, which provided access to Lot 2 without burdening Lot 1. Jacob then applied for the lot split, which was approved and recorded. Cordwell, who accepted both lot splits, testified that he believed the 2003 Lot Split was

intended to establish an access point for Lot 2 through Parcel B and served as a replacement to the 2002 Lot Split.

¶33        Jacob obtained and recorded lot splits that depicted access to the Lots through various access points in Parcel B immediately preceding Lewis's sale to Jacob and Jacob's sale to Bartlett. The 2002 and 2003 Lot Splits demonstrated that Jacob, as the trustee, exercised the control over Parcel B required to situate the land in a manner that benefited the Lots when Jacob and his wife purchased the Lots, and again as the seller of the Lots. As the Lots' seller, Jacob arranged access through Parcel B in a manner that was beneficial to the Lots, but detrimental to Parcel B, because of the proximity of the shared driveway to the location of the proposed home on Parcel B. Such control is sufficient to conclude that there was unity of ownership over the Lots and Parcel B. We conclude that Jacob's concurrent ownership extinguished any express easement that existed on Parcel B concerning the Lots. There was approximately a quarter mile between Lot 1's eastern boundary and the access road, for which the Lots did not have legal access—via an express easement—at the time of the Jacob-Bartlett conveyance. *See supra,* ¶ 3, Figure 1. Accordingly, the Lots did not have an express easement through Parcel B at the time of severance.

### ii.        Bartlett Failed to Show Sufficient Evidence of the Need for Reasonable Access at the Time of the Bartlett-Hiltner Conveyance.

¶34        Without legal access, Bartlett was required to show that at the time of the Bartlett-Hiltner conveyance he lacked reasonable access to his property. Bartlett argues that Lot 2 does not have—and never has had—access through Parcel B. However, as noted above, immediately before selling the Lots to Bartlett, Jacob applied for a building permit concerning Lot 2 and recorded the 2003 Lot Split. The 2003 Lot Split was recorded before the Jacob-Bartlett conveyance and was listed as an exception in Bartlett's title report for the Jacob-Bartlett conveyance.

¶35        Michael Johnson, Bartlett's and Hiltner's architectural designer, testified that the 2003 Lot Split was provided to him when he began designing the Bartlett and Hiltner homes in 2006. He testified that there were "a lot of different discussions because of the confusion" of the two access points. Johnson stated that at some point Bartlett and Hiltner agreed to follow the entrance point through Lot 1 to cut costs and create less disturbance by sharing a driveway and utility site. With that plan, most of the disturbance fell on Lot 1, allowing Bartlett to build the larger home he wanted on Lot 2. Johnson also recalled that he wanted the driveway to

conform with the 2003 Lot Split, but Bartlett refused. Ultimately, Johnson testified that Bartlett and Hiltner could not reach an agreement, and Hiltner built his driveway and home without Bartlett's assistance.

¶36           Although Bartlett asserted that he has always understood access to Lot 2 would be through Lot 1, he could not point to a recorded document to support that understanding. Bartlett insists that it was both his and Hiltner's intent that the shared driveway would follow the 2000 Express Easement. However, the completed Lot 1 driveway does not conform with the 2000 Express Easement; instead, it follows the 2002 Lot Split. Moreover, Bartlett failed to record an express easement granting access for Lot 2 through Lot 1 at the time of the Bartlett-Hiltner conveyance, although he stated that access through Lot 1 was the parties' intent. Bartlett, a mortgage broker at the time, failed to disclose his need for access through Lot 1 in the seller property disclosure statement, which he provided in connection with the Bartlett-Hiltner conveyance. The placement of the driveway and Bartlett's subsequent actions in connection with the Bartlett-Hiltner conveyance do not support Bartlett's contention that Lot 2's access was intended through the 2000 Express Easement.

¶37           There is conflicting evidence in the record regarding the intended access point for the Lots at the time of the Jacob-Bartlett conveyance. The superior court weighed the credibility of the witnesses along with the other evidence and concluded there was no implied way of necessity between the Lots. Given that the 2003 Lot Split indicates a reasonable access point for both lots, the superior court did not abuse its discretion by finding Bartlett failed to establish that Lot 2 lacked reasonable access in 2005 at the time of the severance. *See Coll. Book*, 225 Ariz. at 542, ¶ 32 (failing to present evidence to establish a lack of an outlet at the time of severance prevents a party from prevailing in an action for an implied way of necessity). We defer to the superior court's resolution of the evidence presented. *FL Receivables Tr.*, 230 Ariz. at 166, ¶ 24.

### 4.       The Dabrowskis Prevailed in the Quiet Title Action.

¶38           The Dabrowskis prevailed in the quiet title action because they proved title to the property and that Bartlett had neither an express or implied easement over the Lot 1. Therefore, the Dabrowskis contend the superior court erred by not awarding their attorney's fees and costs under A.R.S. §§ 12-1103(B) and 12-341.01(A). We review the court's decision declining to award fees for an abuse of discretion. *Vicari v. Lake Havasu City*, 222 Ariz. 218, 224, ¶ 23 (App. 2009).

**¶39** Because the Dabrowskis did not correctly request fees under A.R.S. § 12-341.01(A), the superior court did not abuse its discretion by refusing to award them. *See* Ariz. R. Civ. P. 54(g)(1) ("A claim for attorney's fees must be made in the pleadings or in a Rule 12 motion filed before the movant's responsive pleading."); *Klesla v. Wittenberg*, 240 Ariz. 438, 441, ¶ 13, n.2 (App. 2016) ("Contractual attorneys' fees must be pleaded and proved like any other contract claim, as part of the proponent's case in chief.").

**¶40** However, the superior court found that Bartlett was the prevailing party in the quiet title action because "[he] is entitled to an easement created by private condemnation." The court erred. The Dabrowskis originally sued for quiet title. The court concluded that Bartlett did not have a legal interest in Lot 1; thus, the Dabrowskis prevailed in the quiet title action. The Dabrowskis also requested attorney's fees under A.R.S. § 12-1103(B)[2] and complied with the statutory requirements for such an award. Accordingly, we vacate the superior court's conclusion that Bartlett was the prevailing party and remand for the court to enter judgment for the Dabrowskis in the quiet title action, and—in the court's discretion—it may award attorney's fees under A.R.S. § 12-1103(B). *See also Scottsdale Mem'l Health Sys., Inc. v. Clark*, 164 Ariz. 211, 215 (App. 1990) ("[T]he trial court may consider the same factors that are considered in determining whether to award attorney's fees pursuant to A.R.S. section 12-341.01.").

## C. The Court's Ruling that Bartlett Proved the Private Condemnation is Supported by the Evidence.

**¶41** "Arizona law permits a landowner to engage in private condemnation when land 'is so situated with respect to the land of another that it is necessary for its proper use and enjoyment to have and maintain a

---

[2] A.R.S. § 12-1103(B) provides:

> If a party, twenty days prior to bringing the action to quiet title to real property, requests the person, other than the state, holding an apparent adverse interest or right therein to execute a quit claim deed thereto, and also tenders to him five dollars for execution and delivery of the deed, and if such person refuses or neglects to comply, the filing of a disclaimer of interest or right shall not avoid the costs and the court may allow plaintiff, in addition to the ordinary costs, an attorney's fee to be fixed by the court.

way of necessity.'" *Siemsen v. Davis*, 196 Ariz. 411, 414, ¶ 9 (App. 2000) (quoting A.R.S. § 12-1202(A)). "A landowner seeking to condemn a private way of necessity over the lands of another must show a 'reasonable necessity' for the taking." *Id.*

¶42        With respect to the private condemnation action, the Dabrowskis claim the court erred by: (1) awarding Bartlett private condemnation through Lot 1; (2) finding that the Slyder easement was a viable easement choice; (3) failing to award the Dabrowskis additional compensation for the private condemnation; (4) not requiring that the one-time payment for the private condemnation be paid when the easement is recorded; and (5) not imposing additional conditions on Bartlett in connection with the private condemnation.

### 1.        The Court Did Not Abuse Its Discretion by Determining Bartlett is Entitled to a Private Condemnation.

¶43        The Dabrowskis argue that Bartlett is not entitled to private condemnation because the superior court erred by concluding that the 2003 Lot Split did not constitute an express easement, and the existence of the alternative route precludes Bartlett from seeking a private condemnation through their lot. We do not need to decide whether the 2003 Lot Split evidences a valid easement because the mere fact that an alternate legal outlet is available to Bartlett does not, as a matter of law, preclude him from condemning a way over Lot 1. *See Solana,* 69 Ariz. 117, 125 (1949) ("[T]he condemnor need not show an absolute necessity for the taking, a reasonable necessity being sufficient.").

¶44        When determining whether a reasonable necessity exists, the court looks to whether the proponent of the private condemnation has an alternative legal route that is both adequate and reasonable. *See, e.g.*, *Tobias v. Dailey*, 196 Ariz. 418, 422, ¶ 14 (App. 2000). Because there is sufficient evidence in the record to support the superior court's conclusion that "[t]here is no other adequate alternative access" to Lot 2, the court did not abuse its discretion by ordering a private condemnation.

¶45        The route on the 2003 Lot Split may have been reasonable and adequate at the time of the Jacob-Bartlett conveyance. However, subsequent events show that it may no longer be a reasonable alternative. Anderson testified that at the time he purchased Parcel B, the land only contained the access road and a well. After acquiring Parcel B, Anderson constructed a home, and the access road now leads to his driveway and garage. The Town of Cave Creek requires a road or driveway that services

more than one single-family residence to be 16 feet wide with shoulders on each side that are at least two feet wide. To obtain a building permit from the Town of Cave Creek, Bartlett needs a 20-foot-wide easement for the entirety of the easement through the Anderson property. The Anderson driveway is currently 11–12 feet wide and some portions of the driveway have no shoulder at all. Anderson's utilities are on the west side of the driveway, and there is solid rock to the east. In short, the current specifications of the driveway do not comply with the Rural/Metro Fire Department standards for a roadway servicing more than one residence. Civil engineer Christopher Wilson testified that the amount of disturbance that would result from building the road following the 2003 Lot Split would leave approximately 90 square feet available for the actual home on Bartlett's lot.

¶46        These facts support the superior court's finding that there is no other adequate and reasonable alternative access to Lot 2 and its conclusion that Bartlett is entitled to a private condemnation.

### i.        Bartlett is Not Required to Seek Alternative Routes.

¶47        The Dabrowskis argue that Bartlett is not entitled to a private condemnation because Bartlett failed to establish both that "the Town of Cave Creek would not allow Bartlett to build a roadway to the west or south of Bartlett's Lot" and that he "could not obtain an easement to the west or south of his Lot." Thus, the Dabrowskis contend, Bartlett failed to show a reasonable necessity for the taking. The Dabrowskis do not offer legal authority for this contention. Bartlett was not obligated to explore alternative outlets for which he did not have legal access. *See Solana*, 69 Ariz. at 125 ("There is no merit to defendants' contention that [the statute permitting residents to petition to establish a highway], gives to plaintiff an appropriate and expedient method of obtaining a means of ingress and egress to its property by petitioning the board of supervisors for the establishment of a county highway. . . . [P]roviding for condemnation at the instance of a private party the framers of our constitution as well as the legislature affirmatively rejected such a contention."). The court found that Bartlett's potential legal access was inadequate, and thus correctly granted him a private condemnation through Lot 1.

### ii.       The Evidence Does Not Show that Bartlett Voluntarily Landlocked Lot 2.

¶48        Finally, the Dabrowskis maintain Bartlett is not entitled to private condemnation because Bartlett voluntarily landlocked himself. For

support, they cite to *Gulotta v. Triano*, 125 Ariz. 144 (App. 1980). In *Gulotta*, the owners severed their land into parcels, leaving the plot they intended to keep landlocked. *Id.* at 145. The owners testified that the buyers would not have completed the sale with a permanent easement. *Id.* The owners entered into a contract with the buyers for a temporary easement through the property, which would terminate at the earlier of two years or upon the completion of a new road. *Id.* After completion of the road, the owners sought private condemnation through a neighboring parcel, which would grant them access to the new road. *Id.* The owners claimed they were landlocked, or alternatively, that even if the easement had not terminated, the access through the sellers' land was "so inadequate as to make the private right-of-way they seek reasonably necessary." *Id.* This court denied the private condemnation, stating:

> It is obvious from the terms of the agreement for the sale of the delicatessen property that [the owners] appreciated the danger of losing access to the property they retained. Whether they terminated or merely limited their right of ingress and egress in order to complete that sale, they did so voluntarily without first obtaining an alternative access way. The necessity, if any, for a right-of-way across defendants' property was created by their own voluntary act. For that reason alone they are not entitled to the extraordinary remedy afforded by § 12-1202.

*Id.*

¶**49**        The Dabrowskis contend Bartlett "successfully maximized the marketability for the Dabrowski Lot and reaped the financial benefits of a higher purchase price ($440,000), only to thereafter invoke the protections of A.R.S. § 12-1202." They point to the fact that Bartlett did not disclose his need for an easement in the seller property disclosure statement when conveying Lot 1 to Hiltner. But unlike *Gulotta*, there is no evidence that Bartlett appreciated the danger of losing his access or voluntarily relinquished access to seek a private condemnation from the Dabrowskis. This is especially true because the 2003 Lot Split indicated a way to the access road through Parcel B. Therefore, we cannot say that the superior court abused its discretion by awarding Bartlett a private condemnation.

### 2. The Superior Court Must Ultimately Determine the Route of a Private Condemnation.

¶50 The Dabrowskis argue that the court erred by allowing Bartlett to choose among three routes and ordering him to "select the route location and nature of the private way of necessity ensuring the greatest amount of deference to the privacy and concerns of the Dabrowskis." After a court determines that a reasonable necessity exists, "the condemnor makes the initial selection and in the absence of bad faith, oppression or abuse of power its selection of route will be upheld by the courts." *Solana*, 69 Ariz. at 125.

¶51 Our courts have not opined on what constitutes "bad faith, oppression, or abuse of power" in a private condemnation action. In cases of private condemnation, the parties have competing interests, and ultimately it is for the court to settle such differences. *See also Siemsen*, 196 Ariz. at 417, ¶ 25 ("Such lawsuits, as we have indicated, engage strong competing interests and values. To resolve them calls for delicate judgment and a close consideration of all applicable facts."). We hold that absent an agreement, the condemnee may present evidence to the court—including evidence regarding the feasibility, cost, and other relevant details of a specified route—showing that under the circumstances, a more reasonable route exists. If the court determines that the condemnee's suggested route is more reasonable, the condemnee will have made a sufficient showing of bad faith, oppression, or abuse of power. *Accord* A.R.S. § 12-1115(A) (eminent domain statute) ("Where land is required for public use, the state . . . may survey and locate the land, but it shall be located in the manner which will be most compatible with the greatest public good and the least private injury."); *Queen Creek Summit, LLC v. Davis*, 219 Ariz. 576, 580, ¶ 19 (App. 2008) (condemnor in eminent domain action must show that it balanced the "greatest public good" and the "least private injury" when choosing the location, and condemnee can rebut the showing by establishing that the selection is "unnecessarily injurious").

### 3. The Judgment Must be Satisfied Before a Final Order of Condemnation is Issued and the Easement Recorded.

¶52 The Dabrowskis raise several issues relating to the court's order concerning the route, timing of the payment, and terms of the private condemnation. The order provided Bartlett with two options and directed that payment be made before a specified date or before construction on the road begins, "whichever is earliest." The parties dispute whether the taking

occurs at the time of judgment, payment, recording, or construction of the roadway.

¶53 Our constitution is clear: "No private property shall be taken or damaged for public or private use without just compensation having *first* been made, paid into court for the owner [or] secured by bond as may be fixed by the court . . . ." Ariz. Const. art. 2, § 17 (emphasis added); *see also* A.R.S. § 12-1124 (in an eminent domain proceeding, the court "shall set aside and annul the entire proceeding[]" when the condemnee is unable to collect payment). "When the final judgment has been satisfied . . . the court shall make a final order of condemnation, describing the property condemned and the purposes of the condemnation." A.R.S. § 12-1126(A). "The title to the land does not vest in the [condemnor] until 'the final order of condemnation' is made by the court . . . ." *State ex rel. Morrison v. Helm*, 86 Ariz. 275, 280 (1959) (quoting *Pool v. Butler*, 74 P. 444, 446 (Cal. 1903)).

¶54 A court's final judgment of condemnation must include the route, decided by the court if contested, and the amount of compensation for that route. The valuation of the property is determined as the value at the time of the taking. *See City of Scottsdale v. CGP-Aberdeen, L.L.C.*, 217 Ariz. 626, 634, ¶ 36 (App. 2008) ("[W]hen the condemnee offers evidence of a gap in time between the summons date and the date of the taking during which the value of the property increased, the court must determine the date of the taking and whether the value of the property on that date is the same as the value provided for in the statute.").[3]

¶55 Only after the judgment is satisfied, and the court issues the final order of condemnation, can the condemnor record "[a] copy of the order . . . in the office of the county recorder of the county . . . in which the property is located, and thereupon the property described shall vest in [the condemnor] for the purposes therein specified." A.R.S. § 12-1126(B). Accordingly, Bartlett has no rights to the land until after he compensates the Dabrowskis.

¶56 Finally, concerning the parties' contributions for maintenance, "the owners of the easement have the shared duty to repair and maintain the easement." *Freeman*, 226 Ariz. at 247, ¶ 13. The parties

---

[3] Bartlett appeals the court's allowance of post-trial evidence to determine the property's value. We decline to address the issue because the "taking" has not yet occurred and upon remand the court may admit additional evidence.

should work together to agree upon terms for the final order that will minimize future litigation. To the extent that the parties cannot agree on the details of the private condemnation, *Freeman* addresses the parties' rights to contribution when neither the document creating the easement nor a separate agreement between the parties specifies otherwise. *See id.* at 250–51, ¶ 24.

## ATTORNEY'S FEES AND COSTS ON APPEAL

**¶57**        Both sides request costs and attorney's fees incurred in this appeal and cross-appeal under A.R.S. §§ 12-1103(B) and 12-341.01(A). Although we affirmed the superior court's judgment entitling Bartlett to a private condemnation, we denied relief on Bartlett's cross-appeal and reversed the court's determination of the prevailing party in the quiet title action. Therefore, neither party was entirely successful, and we decline to award fees or costs to either party.

## CONCLUSION

**¶58**        We affirm the superior court's judgment that Bartlett is not entitled to a common law easement, but reverse and remand for the entry of judgment in favor of the Dabrowskis in the quiet title action. Accordingly, we vacate the denial of the Dabrowskis' request for attorney's fees, and remand for the court to reconsider the award of attorney's fees to the Dabrowskis as the prevailing parties. We affirm the superior court's determination that Bartlett is entitled to a private condemnation but vacate the portion of the order concerning the route, compensation, terms, and scope, and remand for further proceedings consistent with this opinion.

