IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

IN RE THE MARRIAGE OF

ROBERT R. MCCULLOCH,
*Petitioner/Appellant/Cross-Appellee,*

*and*

CAMERONE E. PARKER,
*Respondent/Appellee/Cross-Appellant.*

No. 2 CA-CV 2023-0026-FC
Filed February 28, 2024

---

Appeal from the Superior Court in Maricopa County
No. FN2020003777
The Honorable Ronda R. Fisk, Judge

**AFFIRMED**

---

COUNSEL

Dickinson Wright PLLC, Phoenix
By Leonce A. Richard and Aurora M. Walker
*Counsel for Petitioner/Appellant/Cross-Appellee*

Alongi Law Firm PLLC, Phoenix
By Thomas P. Alongi and Elizabeth A. Alongi
*Counsel for Respondent/Appellee/Cross-Appellant*

## OPINION

Vice Chief Judge Staring authored the opinion of the Court, in which Judge Sklar and Judge O'Neil concurred.

S T A R I N G, Vice Chief Judge:

¶1 Robert McCulloch appeals from a divorce decree awarding a 2017 Mercedes SUV to Camerone Parker as her sole and separate property, as well as the denial of his motion to alter or amend the decree challenging that ruling. Camerone cross-appeals from the award of reimbursement to Robert for her exclusive occupancy of his sole and separate property between August 2020 and September 2022, as well as the finding that Robert had reimbursed the community for its expenditures on improvements to his sole and separate property. For the following reasons, we affirm.

**Factual and Procedural Background**

¶2 Before Robert and Camerone were married in September 2017, they signed a premarital agreement in which they agreed that their sole and separate property would remain as such. During the marriage, the parties split their time between Robert's sole and separate properties in Phoenix and Sedona.

¶3 In August 2020, Camerone filed for an order of protection against Robert in Cottonwood Municipal Court, alleging domestic abuse. The court issued an ex parte order of protection granting her exclusive use and possession of Robert's sole and separate Sedona home for one year. The order of protection was affirmed after an evidentiary hearing in July 2021.

¶4 Also in August 2020, Robert filed for divorce in Maricopa County Superior Court. Separately, he sent Camerone a letter demanding she vacate the Sedona home pursuant to the terms of their premarital agreement. In the letter, Robert offered to accelerate spousal maintenance payments Camerone was entitled to receive under the premarital agreement if she agreed to vacate the home and "either quash[] her Order of Protection or modif[y] it to remove" the home as a protected location. (Emphasis omitted.) Camerone, however, remained in the home.

¶5 In October 2020, Camerone sought temporary orders for spousal maintenance and "sole and exclusive use of either the Sedona or the

Phoenix residence" pending the decree, noting the order of protection she had obtained against Robert. Robert responded that "there [was] no legitimate basis" for the order of protection and that her exclusive use of either residence for more than three months "constitutes more than the permissible 'limited time' under" Rule 23(h)(2), Ariz. R. Protective Order P. Additionally, Robert moved for a temporary order "directing that [Camerone] immediately vacate his sole and separate Sedona residence." He argued that, pursuant to the parties' premarital agreement, she was prohibited "from claiming any right of continued occupancy in [his] separate property residences" following the filing of a petition for dissolution. In December, the trial court denied Camerone's request for temporary spousal support but granted her "temporary" and "exclusive" use of the Sedona home, adding that she "shall have a law enforcement officer present on civil standby while at the residence in order to comply with the order of protection."

¶6　　　In August 2021, upon expiration of the initial order of protection, Camerone was granted a second order of protection, which prohibited Robert from going "to or near" her "[r]esidence" for another year.[1] The order described Camerone's residential address as "confidential." In October, the trial court adopted a "Stay Away Order" negotiated by the parties, which provided that Camerone would "continue to have exclusive use" of the Sedona home "pursuant to the Court's Temporary Orders." The order also provided Robert would "be entitled to visit the [home] from time to time . . . to inspect the progress of the construction work" so long as he had no contact with Camerone during those visits. The order stated it would expire after one year or upon entry of a divorce decree. Camerone agreed to dismiss the second order of protection upon entry of the Stay Away Order.

¶7　　　In the joint pretrial statement, both parties claimed ownership of a 2017 Mercedes SUV. Robert sought reimbursement for Camerone's exclusive use of his Sedona home, and Camerone sought community reimbursement for spending by Robert on improvements to the Sedona home. In the dissolution decree, the trial court awarded ownership of the SUV to Camerone as her sole and separate property, finding Robert had gifted it to her before the marriage. Further, as the premarital agreement allowed Camerone, upon divorce, to select between having "the remaining

---

[1]The record before us on appeal appears to contain only the first page of the second order of protection, which does not include the date of issuance or judge's signature.

balance owed on automobile awarded to [her] in an amount up to $50,000" or the purchase of a new car of equal value, she opted to receive $50,000 from Robert after being awarded the SUV. The court also ordered Camerone to pay Robert $200,000 for her exclusive use of his separately owned Sedona home from August 2020 to September 2022 and denied her claim for community reimbursement.

¶8 After the denial of Robert's motion to alter or amend the decree to award him the SUV as his separate property, Robert's timely appeal and Camerone's timely cross-appeal followed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1) and 12-2101(A)(1), (2).

## Discussion

### I. Ownership of SUV

¶9 Robert argues the trial court erred in finding that he had gifted the SUV to Camerone before the marriage and that it was her sole and separate property. We review the court's division of property for an abuse of discretion,[2] but the classification of property as separate or community is a question of law we review de novo. *Helland v. Helland*, 236 Ariz. 197, ¶ 8 (App. 2014); *Bell-Kilbourn v. Bell-Kilbourn*, 216 Ariz. 521, ¶ 4 (App. 2007). Whether a gift has been made is a question of fact, and we will not disturb a court's determination unless it is clearly erroneous. *Bobrow v. Bobrow*, 241 Ariz. 592, ¶ 11 (App. 2017). A finding of fact is not clearly erroneous if it is supported by substantial evidence—that is, evidence sufficient for a reasonable person to reach the same result. *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, ¶ 11 (App. 2009).

¶10 As applicable here, gifts are valid if they are "in writing, duly acknowledged and recorded," or if "actual possession of the gift is passed to and remains with the donee or some[]one claiming under him." A.R.S. § 33-601. "A gift is valid under the actual possession provision of [§] 33-601 if the donee is able to establish that there was clear and unmistakable donative intent by the donor, as well as actual possession and control of the property by the donee." *Milner v. Colonial Tr. Co.*, 198 Ariz. 24, ¶ 13 (App. 2000). The donee has the burden of "establish[ing] the existence of a donative intent" by clear and convincing evidence. *O'Hair v. O'Hair*, 109 Ariz. 236, 240 (1973). Although a donor's intent to make a gift must be "clear, unmistakable

---

[2]We review a court's ruling on a motion to alter or amend for an abuse of discretion. *Stock v. Stock*, 250 Ariz. 352, ¶ 5 (App. 2020).

and unequivocal," it need not be express and can be inferred. *In re Marriage of Berger*, 140 Ariz. 156, 162 (App. 1983). "Donative intent is ascertained in light of all surrounding circumstances . . . ." *Id.*

¶11 Here, Robert claims Camerone failed to establish the necessary donative intent because the vehicle had been titled "in his name at all times" and he therefore retained sole legal ownership. He asserts he had merely granted Camerone permission to use the vehicle. In support of his argument, Robert relies on *Cameron v. Cameron*, 148 Ariz. 558 (App. 1985), contending that the circumstances here are analogous despite the fact that the purported gift at issue in that case was purchased during the parties' marriage. Further, Robert argues "no delivery of irrevocable ownership of the Mercedes SUV to [Camerone] ever occurred," pointing to his use of his own money to purchase the vehicle and again asserting he was its legal owner because title had remained solely in his name.

¶12 *Cameron* is not instructive here. It specifically addresses gifts between spouses during a marriage and conversion of community property into separate property. *Id.* at 559. On the record before us, we cannot conclude the trial court erred in finding Robert had gifted the SUV to Camerone prior to marriage and awarding it to her as her sole and separate property. Camerone testified the vehicle was "a Christmas present," pointing to a December 2016 email sent to her by Robert titled "early present," which stated, "[L]ove my girl[,] here's your present," and included a photo of the SUV with a large bow on its hood. Robert stated in the email that the vehicle would be "deliver[ed] to [Camerone] at condo." Robert also registered the vehicle's "Mercedes me" online account in Camerone's name. Thus, the evidence is sufficient to show Robert intended to gift the SUV to her. *See Milner*, 198 Ariz. 24, ¶ 13; *Lehn v. Al-Thanayyan*, 246 Ariz. 277, ¶ 20 (App. 2019) (we do not reweigh evidence on appeal, instead deferring to trial court's determinations of witness credibility and weight given to conflicting evidence).

¶13 The title in Robert's name is not dispositive. Robert cites *Armer v. Armer*, 105 Ariz. 284, 289 (1970), which references a general rule that a gift requires "donative intent, delivery, and the vesting of irrevocable title upon such delivery." But the final provision of § 33-601, which codifies the common law rule that a gift is valid if "actual possession of the gift is passed to and remains with the donee," does not require a formal transfer of legal title.

¶14 Although "[a] *prima facie* presumption of ownership arises from a certificate of title," this presumption may be rebutted. *In re One 1983*

*Toyota Silver Four-Door Sedan, VIN No. JT2MX63E4D0004378*, 168 Ariz. 399, 402 (App. 1991). We have previously reasoned that "'ownership' exists independent of a certificate of title," *Reinke v. All. Towing*, 207 Ariz. 542, ¶ 16 (App. 2004), and the lack of an official registration in the donee's name does not invalidate a gift if actual possession has passed to the donee and the gift remains in their possession, *see Milner*, 198 Ariz. 24, ¶¶ 13-14. Robert does not dispute that the vehicle itself was delivered to Camerone and that it remained in her possession. Therefore, the lack of official title in Camerone's name is not alone sufficient to conclusively establish Robert intended to retain legal ownership of the vehicle rather than gift it to her.

## II. Reimbursement for Camerone's Exclusive Use of Sedona Home

¶15 On cross-appeal, Camerone argues the trial court erred in ordering her to reimburse Robert for her exclusive occupancy of his Sedona home. The court has "broad discretion in determining what allocation of property and debt is equitable under the circumstances," and we will not disturb this determination "absent a clear abuse of discretion." *In re Marriage of Inboden*, 223 Ariz. 542, ¶ 7 (App. 2010). "An abuse of discretion exists when the record, viewed in the light most favorable to upholding the trial court's decision, is devoid of competent evidence to support the decision." *State ex rel. Dep't of Econ. Sec. v. Burton*, 205 Ariz. 27, ¶ 14 (App. 2003). To the extent the court's decision was based on an "interpretation and application of the law, we review its decision *de novo*." *Dabrowski v. Bartlett*, 246 Ariz. 504, ¶ 17 (App. 2019).

¶16 Below, Robert argued he was entitled to reimbursement for Camerone's exclusive use of the Sedona home pursuant to Paragraph 9 of the parties' premarital agreement. That paragraph provided that "the fact that the Parties may reside in one Party's sole and separate residence shall, under no circumstance, give the non-owning Party any right or interest in the residence, including, but not limited to, any right to continued occupancy." It further provided that "[i]n the event that the Parties are residing together in one Party's sole and separate residence upon the filing of a petition for dissolution of marriage," the "non-owning Party shall vacate the residence within a reasonable amount of time after receiving a written request to vacate (but no longer than 30 days)." Robert asserted that, despite his written request in September 2020 that Camerone vacate the Sedona home, as well as his offer to begin paying her spousal maintenance, she had continued to "improperly squat[] on the property." Thus, he argued, Camerone was required to pay him "at least the minimum . . . that he has paid out to maintain the Sedona home" during her exclusive occupancy, which, at the

time of trial, was approximately $380,000. Alternatively, Robert asserted Camerone was required to pay him between $440,000 and $550,000, representing the "full rental value of the home" during that time period.

¶17            In response, Camerone asserted she had been granted exclusive use of the Sedona home in August 2020 pursuant to the initial order of protection, which had been upheld following an evidentiary hearing. She also pointed to the trial court's temporary orders awarding her exclusive use of the home. Further, she challenged Robert's argument regarding the home's rental value, asserting that "because of the ongoing construction projects and maintenance work, the Sedona Home was in no condition to be rented."

¶18            In dividing the parties' assets, the trial court awarded Robert the Sedona home as his sole and separate property. The court then turned to Robert's argument that he was entitled to reimbursement from Camerone "for her exclusive use of the . . . Home . . . during the pendency of the dissolution petition." It first recited the language of the premarital agreement providing that, upon the filing of a petition for dissolution, a party was required to vacate the other party's sole and separate residence "within a reasonable amount of time after receiving a written request to vacate (but no longer than 30 days)." After noting that Camerone had obtained an order of protection in Cottonwood Municipal Court granting her exclusive use of the Sedona home in August 2020—and that Robert "did not immediately seek a hearing" challenging that order—the court discussed Robert's September 2020 written demand that Camerone vacate the home. The court found Robert's offer to accelerate Camerone's spousal maintenance payments "in exchange for [her] vacating the Sedona Home was reasonable." The court concluded that, pursuant to the premarital agreement, "[Camerone] had an obligation to vacate . . . by no later than October 4, 2020."

¶19            The trial court acknowledged the December 2020 temporary order issued in the divorce proceedings granting Camerone exclusive use of the Sedona home, as well as the court's affirmation of the initial order of protection following a hearing and issuance of a second order of protection.[3]

_____

[3]Although the trial court stated in the dissolution decree that "[u]pon expiration of the First OOP, [Camerone] obtained [a] second Order of Protection" awarding her "exclusive use of the Sedona Home," she asserts on appeal that the second order of protection, issued in August 2021, did not specifically identify the Sedona home and instead stated that her

Further, it noted that the orders of protection and the Stay Away Order negotiated by the parties were "silent on the issue of whether [Robert] would be entitled to receive—or [Camerone] would be obligated to pay—an offset/reimbursement for [her] exclusive use of [his] sole and separate property."

¶20     The trial court concluded that, "[g]iven the language of . . . the Premarital Agreement and the directives in § A.R.S. 25-318(A), [Robert] is entitled to a reasonable reimbursement/offset for [Camerone]'s exclusive use of the Sedona Home following the filing of the petition for dissolution of marriage." *See* § 25-318(A) (court shall assign each spouse's sole and separate property to that spouse). The court cited *Cunnington v. Fisk*, No. 1 CA-SA 22-0033 (Ariz. App. May 12, 2022) (mem. decision), for the proposition that the "entry of either an order of protection or temporary order awarding the first party exclusive use of the second party's sole and separate property does not entitle the first party to use the second party's property without reimbursement or offset." As support, it pointed to language from *Cunnington* stating that "because A.R.S. § 25-318(A) unambiguously directs the court to assign each spouse's sole and separate property to such spouse, the superior court was limited in its temporary orders to assigning the [home] to [Robert] as its owner." *Id.* ¶ 7.

¶21     In determining the amount of reimbursement owed to Robert, the trial court considered the fact that the home had been "under construction much of the time [Camerone] occupied the property," concluding that Robert's claim for "full rental value" was therefore unreasonable. The court found "[t]he more reasonable amount" to be fifty percent of the fixed expenses Robert had paid "out of his sole and separate assets" between August 2020 and September 2022, noting that "[he] would have incurred these expenses regardless of whether [Camerone] was occupying the Sedona Home." Accordingly, the court concluded that Robert was entitled to a total of $200,000 from Camerone for the use of his property and that this "equitable approximation" was "reasonable in light of the parties' agreement that [Camerone] would need $15,000/month in spousal maintenance, which would cover the cost of housing and utilities."

¶22     Camerone challenges the trial court's articulated bases for awarding reimbursement to Robert. Those bases include its reliance on the language of the parties' premarital agreement and citation to *Cunnington*, an

address was "confidential." As discussed, the appellate record does not contain the second page of the August 2021 order of protection.

unpublished memorandum decision. Specifically, she contends that although the parties' premarital agreement provided "a deadline for spousal departure from a separately[ ]owned residence," it "outlined no solution if other circumstances," such as the issuance of an order of protection, "intervened." And, Camerone asserts, the court's reliance on *Cunnington* in awarding Robert reimbursement for her exclusive use of the Sedona home violated Rule 111(c)(1), Ariz. R. Sup. Ct.

¶23 Camerone contends the trial court should have instead looked to the "plain and unambiguous" terms of the October 2021 Stay Away Order in deciding whether to order reimbursement. Camerone argues the order's terms "said nothing of rental value, reimbursement, offset, or equalization." Moreover, she contends, although Robert "had every opportunity to bargain for monthly rent or a 'lump sum' equalization payment as the price for [her] future 'tenancy,'" he requested reimbursement for the first time in the parties' joint "pretrial statement filed just three business days before the final hearing." This, she contends, deprived her of "fair notice" and altered the agreed-upon terms of the Stay Away Order. Camerone asserts she "might have declined" to enter into the agreement if she had known she would be required to reimburse Robert for her occupancy of the Sedona home in the amount of $200,000.

¶24 Additionally, Camerone argues Arizona's order of protection statute does "not authorize the assessment of 'rent' against a victim as tradeoff for protective occupancy." Thus, she asserts, because she was occupying the Sedona home as a domestic abuse victim pursuant to orders of protection, the trial court's award of reimbursement to Robert undermines the "letter and spirit" of A.R.S. § 13-3602, "which encourages victims to prioritize their personal safety over financial considerations."

¶25 Robert counters by pointing to the terms of the premarital agreement providing that, following the filing of a petition for dissolution and upon receipt of a written demand, Camerone was required to vacate the Sedona home. And, he asserts, despite the provision in the agreement prohibiting Camerone from receiving temporary spousal support, she nevertheless received such support "by staying rent free in [his] sole and separate residence while he continued to pay for the costs of the residence for two years."

¶26 Robert further maintains that "at no point prior to this appeal did [Camerone] ever raise her current claim that [he] somehow intentionally waived his reimbursement claim by not expressly preserving it in the Stay Away Order." He therefore contends we cannot consider it. Indeed, he

asserts, although the parties' joint pretrial statement "directly addressed the issue of [Robert]'s reimbursement claim for [Camerone's] exclusive use of the Sedona home, [she] devoted less than one page to stating her position on the issue" and "made no argument whatsoever for waiver based on what she now claims to be an implied agreement or '[un]fair notice.'" (Alteration in original.) Similarly, Robert argues, Camerone failed to argue below that the Stay Away Order "constituted a binding contract that somehow operated to amend" the premarital agreement. In any event, he contends Camerone's arguments lack merit because the Stay Away Order's "mere silence" regarding reimbursement does not amount to an "affirmative waiver."

¶27 Finally, Robert argues that although Rule 23(h)(2)(A), Ariz. R. Protective Order P., permits exclusive use of a residence by a non-owning party "for a limited time," nothing in § 13-3602 prohibits reimbursement for such use. Thus, he argues, nothing in the rule or statute, nor any authority cited by Camerone, authorizes occupation of another's property "free of charge."

¶28 Both parties' briefs lack citation to authority, and we are not aware of any, establishing whether a trial court, in a dissolution proceeding, may order a non-owner spouse to reimburse the other spouse for exclusive occupancy of the other's sole and separate property under the specific circumstances present in this case, including Camerone's orders of protection against Robert. In our discretion, however, we decline to find waiver of the parties' respective arguments. *See City of Tucson v. Tanno*, 245 Ariz. 488, ¶ 22 (App. 2018) (court has discretion to decline to find waiver when considering "issues of statewide importance" or "situations in which the public interest is better served by having the issue considered") (quoting *Schoenfelder v. Ariz. Bank*, 165 Ariz. 79, 90 n.8 (1990)); *Harris v. Cochise Health Sys.*, 215 Ariz. 344, ¶ 17 (App. 2007) (court has discretion to hear arguments first raised on appeal). Although the court appears to have relied on *Cunnington* to support its conclusion that reimbursement was warranted, this case does not address whether compensation is owed for the exclusive use of another's sole and separate property. That case concluded only that exclusive use of another's sole property should not be granted through a temporary order during divorce proceedings. No. 1 CA-SA 22-0033, ¶¶ 7-9.[4]

---

[4]In the absence of pertinent legal authority, unpublished decisions issued on or after January 1, 2015, may be cited "for persuasive value." Ariz. R. Sup. Ct. 111(c)(1)(C). Thus, although *Cunnington* is not particularly instructive, the court did not err in citing to it in the decree of dissolution.

**¶29**        Further, to the extent Camerone suggests she lacked sufficient notice of Robert's reimbursement claim prior to the hearing, we disagree. Because the issue of reimbursement was specifically included in the joint pretrial statement, Camerone was given sufficient notice it could be addressed by the court. *See Aetna Cas. & Sur. Co. v. Dini*, 169 Ariz. 555, 557 (App. 1991) ("The pretrial statement serves to narrow the scope of the legal and factual issues to those which are truly legitimate, prevents surprises and facilitates the trial of the case.").

**¶30**        The parties contest whether the negotiated Stay Away Order granted Camerone permission to stay in the Sedona home for free. As the Stay Away Order was an agreement between the parties to replace an order of protection, we review the trial court's interpretation de novo. *See Sowards v. Sowards*, 255 Ariz. 527, ¶ 8 (2023). When determining the meaning of a written agreement, we look to the language used by the parties, and if it is clear and unambiguous, we go no further. *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 472 (1966). Agreements between parties in family court, like other contracts, "are to be read in light of the parties' intentions as reflected by their language and in view of all circumstances; if the intention of the parties is clear from such a reading, there is no ambiguity." *Harris v. Harris*, 195 Ariz. 559, ¶ 15 (App. 1999). We accept the trial court's factual findings as to the intent of the parties unless they are clearly erroneous. *McNeil v. Hoskyns*, 236 Ariz. 173, ¶ 13 (App. 2014); *Chopin v. Chopin*, 224 Ariz. 425, ¶ 7 (App. 2010); Ariz. R. Fam. Law P. 82(a)(5).

**¶31**        As discussed, the trial court determined the Stay Away Order was "silent on the issue of whether [Robert] would be entitled to receive—or [Camerone] would be obligated to pay—an offset/reimbursement for [her] exclusive use of [his] sole and separate property." The order stipulated that, "pursuant to the Court's Temporary Orders," Camerone would continue to have exclusive use of the Sedona home. Based on the plain language of this provision, the intent was the continuation of the temporary orders that awarded Camerone exclusive use in exchange for allowing Robert limited access to the home to oversee construction. The text is unambiguous: the continued occupancy was done in accordance with court orders.

**¶32**        There is no evidence Robert intended to permit Camerone's exclusive occupancy of the Sedona home. Robert attempted to have Camerone vacate the home, offering early payment of spousal support as an incentive. He also objected to her request for temporary orders granting her exclusive use of the home. These actions establish Robert had no desire for Camerone to remain in the home and her continued occupancy was based

solely on the court's orders. On the record before us, we can find no error in the trial court's interpretation of the Stay Away Order.

¶33 The trial court considered the evidence before it, including the effects of the temporary order and the Stay Away Order on possession of the Sedona home, the language of the premarital agreement, and the statutes involved in awarding sole property in a divorce decree, concluding Robert was entitled to reimbursement for his loss of possession during Camerone's stay. *See Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, ¶ 10 (2003) (We will affirm the factual findings of the trial court "so long as they are supported by reasonable evidence."); *cf. Grant v. Ariz. Pub. Serv. Co.*, 133 Ariz. 434, 456 (1982) (abuse of discretion occurs where "conclusion was reached without consideration of the evidence" or where "there is no substantial basis for the trial court's discretionary finding"). Further, nothing in § 13-3602 suggests that an order for exclusive possession alters the separate or community character of a residence or any contractual relationship between the parties. Nor does such an order imply a right to possess property in which the other party also has a right to possession without reimbursement. An order for exclusive use of a residence does not preclude a family court from ordering reimbursement for a party's exclusion from a marital or separate home. *Cf. Ferrill v. Ferrill*, 253 Ariz. 393, ¶¶ 11, 16 (App. 2022) ("In deciding whether a party may be liable for a portion of rent for occupying the community home after a dissolution petition has been served, courts frame the issue as dependent upon whether one spouse has denied the other's right to occupy the marital home."). We find no abuse of discretion and affirm the award of reimbursement. *See In re Marriage of Gibbs*, 227 Ariz. 403, ¶ 16 (App. 2011) (We will "affirm the trial court if its ruling was correct for any reason."); *see also Tena v. Yorgulez*, 24 Ariz. App. 311, 313 (1975) ("[W]e must presume the trial court found the necessary facts to support its judgment, providing there is evidence in the record to support it.").

## III. Community Reimbursement

¶34 Additionally, Camerone argues the trial court erred in "withholding any credit" for community funds spent on renovations to the Sedona home. Specifically, she contends the court "chose an outcome that seemed 'equitable'" rather than "impos[ing] the mandatory consequences required" by the premarital agreement for Robert's "mishandling" of the parties' joint checking account. We review a court's interpretation of a premarital agreement de novo. *See Dunn v. FastMed Urgent Care PC*, 245 Ariz. 35, ¶ 10 (App. 2018) ("Contract interpretation is a question of law we review de novo."). And we view the evidence "in the light most favorable to

upholding the court's rulings." *Dabrowski v. Bartlett*, 246 Ariz. 504, ¶ 17 (App. 2019). We construe a contract between parties to determine and enforce the parties' intent, considering the plain meaning of the words in the context of the contract as a whole. *See Dunn*, 245 Ariz. 35, ¶ 10.

¶35 Here, the parties' premarital agreement states, in relevant part:

14**.** <u>Joint Household Account; Payment of Normal and Routine Community and Household Living Expenses; Monthly Stipend to WIFE</u>. During their marriage, the Parties shall open and maintain a joint household account for purposes of paying their community and reasonable, normal, and routine household living expenses. The following conditions/restrictions shall govern the use of the Parties' incomes and joint household account:

a. During the marriage, HUSBAND shall deposit all of his community income and earnings . . . directly into the joint household account.

. . . .

b. Each Party shall be free to voluntarily contribute, at his or her sole discretion, his or her sole and separate funds to the joint household account. Except as specifically provided in subparagraph (c) below, under no circumstances shall either Party ever be obligated to contribute his or her sole and separate funds to the joint household account and the fact that a Party may have contributed his or her sole and separate funds to the joint household account in the past shall not in any way obligate him or her to contribute any further or additional sole and separate funds to the account at any time. Irrespective of Paragraphs 15 and 20 below, and except as provided in subparagraph (c) below, any sole and separate funds contributed to the joint

household account shall be deemed gifts to the community and the Party contributing said funds to the account shall not be entitled to any refund or reimbursement of those monies.

    c. During the Parties' marriage, HUSBAND shall pay all of the Parties' normal and routine joint and community living expenses. HUSBAND shall utilize his community income and earnings as well as any other community monies deposited into the joint household account to pay the Parties' normal and routine joint and community living expenses. In the event that his community income and earnings are insufficient at any time to cover the Parties' normal and routine joint and community living expenses <u>and</u> there are insufficient funds in the joint household account to cover these expenses, then HUSBAND shall be obligated to utilize his sole and separate funds to pay these expenses. . . . [U]nder no circumstances shall HUSBAND ever be obligated to use his sole and separate funds, his community income and earnings, or any funds in the joint household account, to pay WIFE'S sole and separate expenses; nor shall HUSBAND be entitled to use his community income and earnings, or any funds in the joint household account, to pay his own sole and separate expenses.

    . . . .

    e. In addition to the foregoing, HUSBAND shall pay to WIFE the sum of $5,000 each month from his sole and separate funds to do with as she pleases. This money shall constitute WIFE'S sole and separate funds once received.

    . . . .

15. <u>Right to Reimbursement for Expenditure of Joint, Community, or Separate Funds</u>. The Parties acknowledge that, from time to time, certain of their joint, community, or separate property or funds may be voluntarily used or contributed to benefit their joint, community, or separate property or to pay joint, community, or separate liabilities. In such cases, the Parties agree to the following rights of reimbursement:

    a. <u>Joint or Community Property Used to Benefit Separate Property</u>. Except as otherwise set forth in this Agreement, whenever the Parties' joint or community property or funds are used to maintain, repair, improve, or benefit any separate property or to satisfy any separate liability of a Party, the community shall be entitled to an automatic right of a dollar for dollar reimbursement for the joint or community funds or property so used.

    . . . .

    e. <u>Burden of Proof</u>. It shall be the burden of the Party claiming a right of reimbursement hereunder to establish such right and the amount thereof by credible evidence admissible in a court of law.

    . . . .

20. <u>Commingling of Accounts</u>. Except as otherwise specifically provided herein, the intentional or inadvertent pooling or commingling of the Parties' respective separate monies into any joint or community account or accounts during marriage shall not convert the deposited funds into "community" or "marital" property for any reason. Similarly, the intentional or inadvertent pooling or commingling of joint or community monies into a Party's sole and separate account or accounts

shall not convert the separate account or accounts or the monies therein into "community" or "marital" property for any reason. Rather, all such pooled or commingled monies shall constitute and retain their original character as sole and separate property or community property. In the event that any pooled monies become so commingled that they cannot be readily identified as being separate or community monies, then the commingled monies in the account shall constitute separate and community property in the proportion that the overall value of the respective total contributions of separate and community funds to the account over the account's lifetime bear to one another.

¶36 Below, Camerone argued the community was entitled to approximately $680,000 as reimbursement for funds spent from the parties' joint account to improve the Sedona home. She acknowledged that Robert had earned approximately $1,200,000 in community income during the parties' marriage and that a total of $2,400,000 had been deposited into their joint account.[5] However, Camerone asserted that because Paragraph 14(b) of the premarital agreement provided that "any sole and separate funds contributed to the joint household account shall be deemed gifts to the community" and the contributing party "shall not be entitled to any refund or reimbursement of those monies," any funds in excess of the community earnings deposited into the parties' joint account constituted a gift. She also suggested Robert had failed to provide accounting showing "correlation . . . with what got spent on the Sedona property and what got put into the joint account."

¶37 Robert countered that he had reimbursed the joint account with his sole and separate funds for money spent on improvements to the Sedona home and that there had been "no net contribution of community

---

[5]Despite the provision in the premarital agreement requiring Robert to deposit "all of his community income and earnings . . . directly into the joint household account" during the parties' marriage, Robert testified at trial that his employment earnings were "deposited into [his] main account, and then [he] put monies into the joint account."

monies to [Robert]'s sole and separate Sedona home." Robert's expert witness in forensic accounting testified that only $529,324 had been paid out of the joint account on improvements to the Sedona home. She further testified Robert had earned a net community income of $1,221,387 during the parties' marriage and deposited a total of $2,443,763 into the parties' joint account, pointing to the fact that, "in the aggregate," more money had been "transferred out of the sole and separate account into the joint account than the community funds that went in." Additionally, Robert's expert testified the total deposits into the joint account had exceeded his $2,375,000 "total obligation of disbursements" consisting of "all of the community expenses, plus the separate expenses, plus all the payments he was required to make to" Camerone. And she explained she had "tied out" all transfers between Robert's separate bank account and the parties' joint account and had concluded the community was reimbursed for all expenses related to improvement of the Sedona home "under an accounting."

¶38 In the decree of dissolution, the trial court acknowledged that "[t]here were occasions when funds from the Joint Accounts were used to pay for . . . improvements to the Sedona Home," finding that the total amount of those expenses was approximately $529,000. The court concluded "[a]ll amounts spent on the improvements of the Sedona Home were paid by [Robert] from his sole and separate accounts" because he had "either prepaid or reimbursed the Joint Accounts for all improvements from his sole and separate accounts." It further concluded Robert's "practices . . . fulfilled the 'plain meaning of the words used and the manifest intent and purposes of the Parties'" set forth in the premarital agreement.

¶39 On cross-appeal, Camerone maintains that, pursuant to the terms of the premarital agreement, "money that became marital property through subsequent deposit into the joint account" constituted a gift to the community and "could not then also serve as reimbursement for *other* marital money already pulled out to serve [Robert]'s sole and separate purpose."[6] (Emphasis in original.) Further, she argues, Robert "abjectly failed to demonstrate the sort of accounting that would" support the trial court's

---

[6]Although Paragraph 14 of the premarital agreement provided that the parties shall, "[d]uring their marriage," "open and maintain a joint household account," Robert and Camerone testified at trial that they had instead continued to use a joint account opened before marriage. The court concluded this account had "served the same purpose" as the joint account referenced in the parties' premarital agreement.

conclusion, pointing to the lack of evidence that deposits into the joint account matched disbursements. Accordingly, Camerone contends the community has not yet been reimbursed for the approximately $529,000 spent to improve Robert's Sedona home.

¶40 Robert contends that if any extra money deposited into the parties' joint account automatically became a "gift" that could not be credited toward reimbursement, it would be impossible to reimburse the community. Instead, he argues, because he "contributed $1,222,376 in excess monies into the parties' joint account over and above the community earnings he was required to deposit" under the premarital agreement, he "fully complied" with the express terms of the agreement "in reimbursing the community for his use of community funds to pay separate expenses." He asserts "[t]hese extra funds were over twice the amount of the . . . community funds that [Camerone] complains [he] spent on sole and separate expenses." In support of his argument, Robert points to the agreement's lack of a "mandated method or set protocol" for reimbursement and the court's duty to "reasonably harmonize" all of its terms.

¶41 In ascertaining the intent of the parties, we "look to the plain meaning of the words as viewed in the context of the contract as a whole." *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 259 (App. 1983). As discussed, Paragraph 14(b) of the premarital agreement states that "[*i*]*rrespective of* Paragraphs 15 and 20 below, . . . any sole and separate funds contributed to the joint household account shall be deemed gifts to the community." (Emphasis added.) The definition of "irrespective of" is "[w]ithout consideration of" or "regardless of." *Irrespective of*, The American Heritage Dictionary (5th ed. 2011); *see also Centerpoint Mech. Lien Claims, LLC v. Commonwealth Land Title Ins. Co.*, 255 Ariz. 261, ¶ 45 (App. 2023) (In construing a contract, "we 'give words their ordinary, common sense meaning'" and "we may consider dictionary definitions to assist in determining the ordinary meaning of words." (quoting *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 220 Ariz. 202, ¶ 23 (App. 2008))). Thus, this portion of Paragraph 14(b) ordinarily should be understood as follows: Regardless of "Paragraphs 15 and 20 below, . . . any sole and separate funds contributed to the joint household account shall be deemed gifts to the community."

¶42 However, interpreting Paragraph 14(b) strictly as worded would render Paragraphs 15 and 20 unnecessary because their application would always be overruled by Paragraph 14(b). *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 158 n.9 (1993) ("[A] contract should be

interpreted, if at all possible, in a way that does not render parts of it superfluous."). Therefore, we conclude Paragraphs 15 and 20 establish specific exceptions to Paragraph 14(b)'s general rule that all sole and separate funds become gifts. *See Gfeller v. Scottsdale Vista N. Townhomes Ass'n*, 193 Ariz. 52, ¶ 13 (App. 1998) ("We will, if possible, interpret a contract in such a way as to reconcile and give meaning to *all of its terms*, if reconciliation can be accomplished by any reasonable interpretation." (emphasis added)). As such, the agreement excludes all of Paragraph 15, including community reimbursement funds, from Paragraph 14(b)'s classification of funds deposited into the parties' joint account as gifts. Accordingly, any separate funds deposited into the joint account to reimburse the community for expenditures benefitting a party's separate property do not constitute gifts to the community.

¶43 Moreover, the premarital agreement does not specify how, when, or in what form community reimbursement was to be made, aside from being "dollar for dollar." The agreement merely reflects that when community funds are spent to benefit a party's sole and separate property, the community is entitled to reimbursement. Likewise, the agreement is also silent on what, if any, accounting is necessary to qualify a deposit as a reimbursement, or where reimbursement payments could be made if not to the joint account. We will not assume such requirements exist absent express language in the agreement. *See Emps. Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, ¶ 24 (2008) (court will not "add something to the contract which the parties have not put there" (quoting *D.M.A.F.B. Fed. Credit Union v. Emps. Mut. Liab. Ins. Co.*, 96 Ariz. 399, 403 (1964))). As such, Camerone's argument that Robert did not properly account for his reimbursements fails.

¶44 The parties do not dispute that Robert deposited into the joint account from his sole and separate account an amount of approximately twice his employment-related earnings during the marriage. Robert testified he had "never spent a penny out of that account that wasn't reimbursed." Robert's expert witness testified that when Robert deposited money into the joint account, "some of it was to reimburse the account for sole and separate expenses." And, as discussed, she testified the community had been reimbursed for all expenses related to improvement of the Sedona home "under an accounting" because the total deposits into the joint account had exceeded his $2,375,000 "total obligation of disbursements" consisting of "all of the community expenses, plus the separate expenses, plus all the payments he was required to make to" Camerone. Thus, the trial court did not err in concluding Robert had already reimbursed the community for

expenditures on his sole and separate property as required under the terms of the premarital agreement.

## Disposition

**¶45** For the foregoing reasons, we affirm the trial court's rulings. Camerone requests an award of attorney fees and costs on appeal. In our discretion, after considering the relative financial resources of the parties and the reasonableness of their positions on appeal, we deny Camerone's request. *See* A.R.S. § 25-324(A).